**HOLLAND & KNIGHT LLP**
Laura Renstrom, Esq.
Florida Bar No. 108019
laura.renstrom@hklaw.com
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000

**CALCAGNI & KANEFSKY LLP**
Mariellen Dugan, Esq. (*pro hac vice* forthcoming)
Martin B. Gandelman, Esq. (*pro hac vice* forthcoming)
Philip Morrow, Esq. (*pro hac vice* forthcoming)
One Newark Center
1085 Raymond Boulevard, 18th Floor
Newark, New Jersey 07102
T.:  (862) 233-8319
E.:  MDugan@ck-litigation.com

*Attorneys for Plaintiff Blue Cross and Blue
Shield of Florida, Inc.*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., | Civ. Action No.: |
| *Plaintiff*, | |
| v. | **DECLARATORY RELIEF REQUESTED** |
| MAS PRO GROUP LLC, ESSENCE RECOVERY CENTER INC., UPLIFT RECOVERY CENTER LLC, UPLIFT RECOVERY NOHO LLC, AVAN WELLNESS CENTER, RISE AND RENEW INC., INSPIRE RECOVERY CENTER INC., PATHWAY TO RECOVERY INC., INNERVISIONS RECOVERY CENTER LLC, | |

LAKERIDGE RECOVERY CENTER, HARMONY HILLS RECOVERY INC., LOVE & LIGHT RECOVERY CENTER INC., NEW BREATH RECOVERY INC., ENTRUST RECOVERY CENTER INC., 4 SEASON DETOX AND RECOVERY HOUSE INC., INNER LIGHT RECOVERY LLC, BABAL INC., SPIRITUAL WELLNESS AND RECOVERY INC., SUN AND MOON REHABILITATION, EHG ENTERPRISES INC., DELUXE TREATMENT CENTER INC., AMS PRO GROUP LLC, CA DRUG DETOX LLC, NEBO HILL TREATMENT CENTER, SERENITY PATH RECOVERY INC., 1ST HOUSE OF LIFE INC., CLEAR CONSCIENCE TREATMENT CENTER LLC, NEW LIFE INC., SAINT LAWRENCE RECOVERY, MEDICHEX INC., LNA REALTY, COMFORT RECOVERY TREATMENT CENTER LLC, META WELLNESS INC., BLUE STREAM ENTERPRISES INC., WE CARE OUTPATIENT LLC, VANITY DETOX CENTER, INC., VANITY WELLNESS CENTER INCORPORATED, COMFORT RECOVERY IOP LLC, "JOHN DOES" 1-10 (names fictitious), and "ABC COMPANIES" 1-10 (names fictitious),

*Defendants.*

## COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiff Blue Cross and Blue Shield of Florida, Inc. ("Plaintiff" or "Florida Blue"), by and through its attorneys, Calcagni & Kanefsky LLP, as and for its Complaint against Defendants MAS Pro Group LLC, Essence Recovery Center Inc.,

Uplift Recovery Center LLC, Uplift Recovery Noho LLC, Avan Wellness Center, Rise and Renew Inc., Inspire Recovery Center Inc., Pathway to Recovery Inc., Innervisions Recovery Center LLC, Lakeridge Recovery Center, Harmony Hills Recovery Inc., Love & Light Recovery Center Inc., New Breath Recovery Inc., Entrust Recovery Center Inc., 4 Season Detox And Recovery House Inc., Inner Light Recovery LLC, Babal Inc., Spiritual Wellness and Recovery Inc., Sun And Moon Rehabilitation, EHG Enterprises Inc., Deluxe Treatment Center Inc., AMS Pro Group LLC, CA Drug Detox LLC, Nebo Hill Treatment Center, Serenity Path Recovery Inc., 1st House of Life Inc., Clear Conscience Treatment Center LLC, New Life Inc., Saint Lawrence Recovery, Medichex Inc., LNA Realty, Comfort Recovery Treatment Center LLC, Meta Wellness Inc., Blue Stream Enterprises Inc., We Care Outpatient LLC, Vanity Detox Center, Inc., Vanity Wellness Center Incorporated, Comfort Recovery IOP LLC, John Does 1-10, and ABC Companies 1-10 (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.     Florida Blue, licensed by the State of Florida, is a subsidiary of Guidewell, a not-for-profit company.  Florida Blue provides health insurance Florida, offering individual, family and employer health plans to Florida residents.

2.     Defendants are 38 out-of-network facilities providing substance use disorder ("SUD") treatment in the State of California.

3.     This case involves a large-scale, coordinated scheme to exploit for profit individuals suffering from SUD.  In 2025 and 2026, Defendants and their

2

co-conspirators unlawfully solicited and recruited people struggling with SUD, fraudulently enrolled them in lucrative Florida Blue plans (issued pursuant to the Patient Protection and Affordable Care Act (the "ACA")), and offered the patients kickbacks, including paying their insurance premiums, to obtain treatment at the defendants' California facilities. Defendants' recruitment of these patients did not stem from a genuine desire to help people in need. Rather, it was motivated by Defendants' intention to profit from addiction.

4.     Defendants' scheme came to Florida Blue's attention in late 2025 when it noticed a significant and unexplained increase in claims for SUD treatment by Defendants. In 2024, Defendants collectively billed Florida Blue approximately $7.8 million in claims for SUD treatment of Florida Blue members.[1] Just one year later, in 2025, that number skyrocketed to $269 million, amounting to an increase of over three thousand percent. The sharp rise in claims by one Defendant, Uplift Recovery Noho, is revealing. Between 2021 and 2024, 15 Florida Blue members received treatment at Uplift Recovery Noho; yet in 2025, 200 first-time Florida Blue enrollees were treated at this facility. By contrast, the number of claims submitted to Florida Blue during the same period for members who received SUD

---

[1] For ease of reference, Florida Blue refers to patients purportedly enrolled in Florida Blue ACA Plans, who sought treatment from Defendants, as "members." For the avoidance of doubt, these so-called members were not legitimate Florida Blue members because as described in detail below they were fraudulently enrolled in plans and they received kickbacks to enroll in Florida Blue plans and attend treatment at Defendants' California facilities, rendering them ineligible for coverage under both the ACA and the terms and conditions of Florida Blue's policies.

3

treatment both in and out-of-network in Florida remained largely unchanged. This spike was not caused by an increase in SUD patients in Florida. Rather, as explained below, it was the product of Defendants' scheme to defraud Florida Blue.

5.      Beyond the sudden and marked increase of claims for out-of-state SUD treatment, Defendants' claims for reimbursement raised other red flags. The large number of claims for treatment by out-of-network, California SUD treatment facilities was highly unusual for Florida Blue because members are incentivized to seek care from in-network providers and most members chose in-state providers to avoid travel and other expenses resulting from out-of-state care.

6.      Furthermore, as detailed below, Defendants' claims were accompanied by tell-tale signs of fraud including a systematic pattern of false enrollment information for members treated by Defendants. For example, upon information and belief, at least 30 percent of the individuals for whom claims were submitted by Defendants did not reside in Florida when Defendants enrolled them in a Florida Blue ACA Plan.[2] Enrollment records show that a single Florida address was listed on 117 separate enrollments, another address was found on 88, and a third on 53. Each address was used to enroll individuals who were treated at facilities owned and/or operated by Defendants. All three addresses are non-

---

[2] Florida Blue is not licensed to insure non-Florida residents. Accordingly, all Florida Blue policies state that to be eligible for coverage, the applicant must reside in Florida.

permanent homeless shelters or service providers for the unhoused in Tampa and Orlando, Florida.

7.     Additionally, treatment records demonstrate a strategic and coordinated effort among Defendants to shuffle patients between their treatment centers for the purpose of maximizing profits.  For example, of approximately 1,300 members treated at Defendants' California facilities, almost 300 were treated at more than one of Defendant's facilities.  One member was purportedly treated at **seven** different facilities owned or operated by Defendants.

8.     Evidence of Defendants' coordinated scheme to defraud Florida Blue is also found in Florida Blue's premium payment records, which show that Defendants and their co-conspirators used at least a dozen payment sources to pay premiums on behalf of individuals they improperly enrolled.  By way of example, a single debit card was used to pay 90 insurance premiums for 75 different individuals and a single bank account was used to pay 96 insurance premiums for 74 different individuals.  Some of those individuals were funneled to the same group of Defendant facilities. This pattern of premium payments from dozens of common sources, each tied to scores of members, clearly demonstrates a coordinated scheme rather than independent payments from individual members.

9.     In executing this scheme, Defendants submitted false and fraudulent claims to Florida Blue totaling millions of dollars. Beyond injuring Florida Blue, Defendants' fraud, involving at least 38 treatment centers and hundreds of fraudulently enrolled "members," directly harmed legitimate Florida Blue

members and Florida consumers by artificially inflating health insurance costs, which are borne by consumers in the form of increased premiums, higher deductibles, and reduced benefits.

10.    Not satisfied with having obtained more than $52 million in fraudulent payments from Florida Blue in 2025 and 2026, Defendants now insist that they be paid for fraudulent claims that Florida Blue properly denied or pended.  On April 14, 2026, Defendants demanded payment of millions of dollars in unpaid claims and further demanded that Florida Blue cease and desist from any attempts to retroactively terminate policies or to seek permission from the Centers for Medicare and Medicaid Services ("CMS") to rescind policies.[3]

11.    Enough is enough.  Florida Blue now brings this action to obtain redress from Defendants for their fraudulent and unlawful conduct, to obtain a declaration that Florida Blue has no obligation to pay Defendants' fraudulent claims, to recover the millions of dollars wrongfully obtained from Florida Blue, and to stop Defendants from continuing their predatory scheme.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and this action is between citizens of different states.

---

[3] To date, CMS has approved Florida Blue's request to rescind 60 Florida Blue ACA policies for members implicated in this case. *See infra*, ¶ ¶ 68-70.

13.    This Court has personal jurisdiction over each Defendant under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2), because each Defendant committed tortious acts within Florida, directed its tortious conduct to Florida and caused injury in Florida.  Specifically, each Defendant made false representations to Florida Blue concerning patient eligibility and residency, fraudulently enrolled individuals in Florida Blue ACA Plans and illegally recruited patients to seek out-of-state treatment at their California facilities.  And each Defendant received payments from Florida Blue as a result of its participation in the scheme.

14.    Venue is proper in this Court, including under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.  Specifically, Defendants and their co-conspirators unlawfully recruited vulnerable individuals from shelters and service providers in this judicial district, fraudulently enrolled those individuals in Florida Blue ACA Plans using addresses in this judicial district, and then submitted false and fraudulent claims for reimbursement to Florida Blue, which is located in this judicial district.

15.    All conditions precedent to the initiation of this action have occurred, been satisfied, or waived.

## THE PARTIES

### A.    Florida Blue

16.    Florida Blue is a Florida corporation with a principal place of business in Jacksonville, Florida.  Florida Blue administers and/or insures healthcare

7

benefit plans and/or policies for medical, surgical, behavioral, and mental health services lawfully rendered by eligible providers pursuant to the terms of health benefit plans issued to individuals and employers in Florida. Florida Blue is licensed by the State of Florida and may only insure Florida residents.

## B. Defendants

17. Defendant MAS Pro Group LLC ("Mas PRO") is a California limited liability company with a principal business address in Northridge, California.

18. Defendant Essence Recovery Center Inc. ("Essence Recovery") is a California stock corporation with a principal business address in Reseda, California.

19. Defendant Comfort Recovery IOP LLC ("Comfort Recovery") is a California limited liability company with a principal business address in Agoura Hills, California.

20. Defendant Uplift Recovery Center LLC ("Uplift Recovery") is a California limited liability company with a principal business address in Pasadena, California.

21. Defendant Uplift Recovery NoHo LLC ("Uplift Noho") is a California limited liability company with a principal business address in North Hollywood, California.

22. Defendant Avan Wellness Center ("Avan Wellness") is a California stock corporation with a principal business address in Van Nuys, California.

8

23. Defendant Rise and Renew Inc. ("Rise and Renew") is a California stock corporation with a principal business address in Sylmar, California.

24. Defendant Inspire Recovery Center Inc. ("Inspire Recovery") is a California stock corporation with a principal business address in Van Nuys, California.

25. Defendant Pathway to Recovery Inc. ("Pathway to Recovery") is a California stock corporation with a principal business address in Van Nuys, California.

26. Defendant Innervisions Recovery LLC ("Innervisions") is a California limited liability company with a principal business address in Northridge, California.

27. Defendant Lakeridge Recovery Center ("Lakeridge Recovery") is a California stock corporation with a principal business address in Los Angeles, California.

28. Defendant Harmony Hills Recovery Inc. ("Harmony Hills Recovery") is a California stock corporation with a principal business address in Sylmar, California.

29. Defendant Love & Light Recovery Center Inc. ("Love & Light Recovery") is a California stock corporation with a principal business address in North Hollywood, California.

9

30.    Defendant New Breath Recovery Inc. ("New Breath Recovery") is a California stock corporation with a principal business address in Simi Valley, California.

31.    Defendant Entrust Recovery Center Inc. ("Entrust Recovery") is a California stock corporation with a principal business address in San Fernando, California.

32.    Defendant 4 Season Detox And Recovery House Inc. ("4 Season Detox") is a California stock corporation with a principal business address in Simi Valley, California.

33.    Defendant Inner Light Recovery LLC ("Inner Light Recovery") is a California limited liability company with a principal business address in Encino, California.

34.    Defendant Babal Inc. ("Babal") is a California stock corporation with a principal business address in North Hollywood, California.

35.    Defendant Spiritual Wellness and Recovery Inc. ("Spiritual Wellness") is a California stock corporation with a principal business address in Sherwood Forest, California.

36.    Defendant Sun And Moon Rehabilitation ("Sun and Moon") is a California stock corporation with a principal business address in Arleta, California.

37.    Defendant EHG Enterprises Inc. ("EHG") is a California stock corporation with a principal business address in Los Angeles, California.

38. Defendant Deluxe Treatment Center Inc. ("Deluxe Treatment") is a California stock corporation with a principal business address in Reseda, California.

39. Defendant AMS Pro Group LLC ("AMS Pro") is a California limited liability company with a principal business address in Northridge, California.

40. Defendant CA Drug Detox LLC ("CA Drug Detox") is a California limited liability company with a principal business address in Los Angeles, California.

41. Defendant Nebo Hill Treatment Center ("Nebo Hill Treatment") is a California stock corporation with a principal business address in Agua Dulce, California.

42. Defendant Serenity Path Recovery Inc. ("Serenity Path Recovery") is a California stock corporation with a principal business address in Pasadena, California.

43. Defendant 1st House of Life Inc. ("1st House of Life") is a California stock corporation with a principal business address in Simi Valley, California.

44. Defendant Clear Conscience Treatment Center LLC ("Clear Conscience Treatment") is a California limited liability company with a principal business address in Chatsworth, California.

45. Defendant New Life Inc. dba Luxe Recovery ("New Life") is a California stock corporation with a principal business address in Los Angeles, California.

11

46.    Defendant Saint Lawrence Recovery is a California stock corporation with a principal business address in Panorama City, California.

47.    Defendant Medichex Inc. ("Medichex") is a California stock corporation with a principal business address in Anaheim, California.

48.    Defendant LNA Realty ("LNA Realty") is a California stock corporation with a principal business address in North Hollywood, California.

49.    Defendant Comfort Recovery Treatment Center LLC ("Comfort Recovery Treatment") is a California limited liability company with a principal business address in Agoura Hills, California.

50.    Defendant Meta Wellness Inc. ("Meta Wellness") is a California stock corporation with a principal business address in Glendale, California.

51.    Defendant Blue Stream Enterprises Inc. ("Blue Stream") is a California stock corporation with a principal business address in Glendale, California.

52.    Defendant We Care Outpatient LLC ("We Care") is a California limited liability company with a principal business address in Beverly Hills, California.

53.    Defendant Vanity Detox Center, Inc. ("Vanity Detox") is a California stock corporation with a principal business address in Van Nuys, California.

54.    Defendant Vanity Wellness Center Incorporated ("Vanity Wellness") is a California stock corporation with a principal business address in Woodland Hills, California.

55. Defendant Comfort Recovery IOP LLC ("Comfort Recovery") is a California limited liability company with a principal business address in Agoura Hills, California.

56. Defendants "John Does" 1-10, these names being fictitious, are individuals whose identities cannot be ascertained as of the filing of this Complaint. Upon information and belief, John Does 1-10 include patient brokers, recruiters, and other individuals who assisted Defendants in recruiting patients, enrolling patients in Florida Blue ACA Plans using false information, paying patient premiums, and transporting patients to Defendants' California facilities.

57. Defendants "ABC Companies" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint Upon information and belief, ABC Companies 1-10 include entities that operated the payment sources used to pay insurance premiums for individuals treated by Defendants, entities that arranged transportation and lodging for patients, and other entities that facilitated Defendants' fraudulent scheme California.

## FACTUAL ALLEGATIONS

**A. Florida Blue's Provision of Individual Health Insurance Under the ACA.**

### 1. Relevant Statutory Framework of the ACA.

58. The ACA, which was enacted in 2010, required most Americans to obtain minimum essential health insurance coverage. By the same token, the statute "'ensure[s] that anyone can buy [health] insurance.'" *Maine Cmty. Health*

*Options v. United States*, 590 U.S. 296, 301 (2020) (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)).

59.     The ACA provides that an "applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month."  26 U.S.C. § 5000A(a).  The ACA defines "applicable individual" as all taxpayers who did not come within any of a set of identified exemptions.  26 U.S.C. § 5000A(d). "Minimum essential coverage" under the ACA includes coverage under a health plan offered in "the individual market within a State."  26 U.S.C. § 5000A(f)(1)(C).  The ACA also provides for a system of premium tax credits that effectively subsidize the cost of health insurance to make it more affordable for certain qualifying individuals.  *See* 26 U.S.C. § 36B.

60.     The ACA required states to create virtual health-insurance marketplaces, known as "American Health Benefit Exchanges," to, among other things, facilitate the purchase by individuals of "qualified health plans[.]"  42 U.S.C. § 18031(b)(1).  Individuals may apply for enrollment in a qualified health plan ("QHP") through the Health Insurance Marketplace at HealthCare.gov (the "Marketplace"), a website operated by CMS when the State in question is using the Marketplace.  Using the Marketplace, residents of Florida and other states without their own separate health insurance marketplaces can apply for health insurance coverage under a QHP that provides the essential health benefits mandated by the ACA.

14

61. QHPs must be "offered by a health insurance issuer that is . . . licensed and in good standing to offer health insurance coverage in each State in which such issuer offers health insurance coverage under this title."  42 U.S.C. § 18021(a)(1)(C)(i).  In addition, QHPs must provide the "essential health benefits package," which must include coverage across at least ten specific categories, one of which is "[m]ental health and substance use disorder services, including behavioral health treatment."  42 U.S.C. § 18022(b)(1)(E).

62. The ACA establishes four coverage levels, each measured by "actuarial value," meaning the percentage of total average costs for covered benefits that the plan is expected to pay:   (i) bronze (actuarially equivalent to approximately 60% of the full actuarial value of benefits), (ii) silver (actuarially equivalent to approximately 70% of the full actuarial value of benefits), (iii) gold (actuarially equivalent to approximately 80% of the full actuarial value of benefits), and (iv) platinum (actuarially equivalent to approximately 90% of the full actuarial value of benefits). 42 U.S.C. § 18022(d).  Generally speaking, platinum plans require the highest premium payments and have the lowest costs of care whereas bronze plans have the lowest premium payments but high deductibles and out-of-pocket costs.

63. By law, a health insurer may vary the premium rate for health insurance coverage offered in the individual market based on only four factors, one of which is the rating area, a geographical area within each state established by the state or CMS.  *See* 42 U.S.C. § 300gg(a).  For individual insurance coverage, the rating area is determined based on the primary policyholder's address.  *See* 45

15

C.F.R. § 147.102(a).  CMS has determined that each Florida county is a separate rating area.[4]

64.     When applying for coverage through the Marketplace, applicants are required to provide demographic information including their place of residence. 42 U.S.C. § 18081(b); 45 C.F.R. § 155.305(a).  CMS uses the applicant's home address to determine the correct service area, the specific health plans available to the applicant, and eligibility for financial assistance, including premium tax credits.

65.     Individuals applying for insurance coverage through the Marketplace are required to attest to the truth of the information provided to CMS.

66.     When an individual applies for coverage through the Marketplace, an initial enrollment transmission is sent to the insurer, after an application has been determined to be eligible and the applicant has selected a QHP.  CMS is responsible for determining whether an applicant is eligible for enrollment in a QHP.  45 C.F.R. § 155.305(a).

67.     Health insurers are required to process enrollments when CMS notifies the issuer that the individual requesting enrollment in a QHP is a qualified individual, provided CMS sends the necessary information to the insurer.  45 C.F.R. § 156.265(a)(b).

---

[4] *See* Centers for Medicare & Medicaid Services, Florida Specific Geographic Rating Areas: Including State Specific Geographic Divisions, available at https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-market-reforms/fl-gra.

68.     Under the guaranteed issue and guaranteed renewability provisions of the ACA, insurers must accept any individual that applies for coverage or seeks to renew coverage, unless a specific exception applies, such as when the individual has failed to pay his or her premiums or in cases of fraud.  45 C.F.R. § 147.104(a); 45 C.F.R. § 148.122. Insurers are only permitted to terminate an individual's enrollment in a QHP in certain circumstances.  45 C.F.R. § 156.270(a); 45 C.F.R. § 155.430(b).  Thus, while an insurer may terminate a member for failure to pay premiums, an insurer may not terminate enrollment of a QHP member for enrollment fraud absent approval from CMS.

69.     The ACA provides that an insurer may rescind an individual's coverage under a QHP (*i.e.*, retroactively terminate coverage back to the effective date of the coverage) where the individual, or a person seeking coverage on behalf of the individual, performs an act, practice, or omission that constitutes fraud, or makes an intentional misrepresentation of material fact but only upon approval by CMS.  *See* 45 C.F.R. § 147.128(a)(1).

70.     An insurer must submit rescission requests to CMS for QHP members in cases where enrollees or someone acting on their behalf intentionally provided false information to enroll in a QHP where, but for the false information, they would not have been eligible. *See* CMS, "Determining Unauthorized Enrollments (UE) vs Rescissions" presentation, Jan. 12, 2026; CMS, 2024 Federally-facilitated Exchange (FFE) Enrollment Manual at § 12.6, available at https://www.cms.gov/files/document/ffe-enrollment-manual-2024-5cr-

082024.pdf.  Insurers must demonstrate, "to the reasonable satisfaction of the Exchange, that the rescission is appropriate." 45 C.F.R. § 155.430(b)(2)(iii).

### 2. Florida Blue's Role in the Individual Health Insurance Market in Florida.

71.    Florida Blue offers health insurance plans to residents of all Florida's 67 counties.

72.    Because Florida did not establish the state exchange contemplated by 42 U.S.C. § 18031(b), Florida Blue offers insurance plans through the Exchange.

73.    In addition to offering plans through the federal Marketplace found at healthcare.gov, Florida Blue offers QHPs to individuals through its own website, as well as insurance brokers and agents and a paper application form.

74.    Florida Blue is only licensed to offer insurance coverage to Florida residents, and it is not licensed to operate in any other state as an insurance company.  Florida Blue policies state unequivocally that all members must reside in Florida to be eligible for coverage.  For example, Florida Blue's Blue Options Silver 24J01-03C plan (the "24J01 Plan"), a copy of which is attached hereto as **Exhibit A**, provides that, to be eligible to apply for coverage, the member must "live, or reside in the Service Area."  **Exhibit A** at ELG-1.  "Service Area" in the context of ACA plans is defined as the "geographic area certified by the Marketplace[.]" *Id.* at DEF-6.

18

75.    Additionally, all Florida Blue's policies make clear that applicants for coverage must provide truthful and accurate information.  For instance, the 24J01 Plan states:

> All factual representations made by you to Florida Blue and the Marketplace in writing in connection with the issuance of this Contract and enrollment hereunder must be accurate and complete. Any false, incomplete or misleading information provided during the enrollment process, or at any time, may cause you to be disqualified for coverage and, in addition to any other legal right we may have, we may terminate or Rescind your coverage.

*Id*. at ELG-2.

76.    Florida Blue's policies further provide: "You agree that if you obtain coverage through the Marketplace we may rely on information provided to us on your behalf as if they are 'you' for administrative purposes including but not limited to eligibility and member data." *See, e.g.*, *id*. at ELG-3.

77.    Florida Blue's policies similarly state in unambiguous terms that Florida Blue is not obligated to cover people who were not properly enrolled.  For example, the 24J01 Plan states:  "Any person who is not properly enrolled with us through the Marketplace will not be covered under this Contract. We will have no obligation whatsoever to any person who is not properly enrolled[;]" and "[w]e will not provide coverage or benefits to any person who would not have been eligible to enroll with us, had accurate and complete information been provided to us on a timely basis. In such cases, we may require you or a person legally responsible for you, to reimburse us for any payments we made on your behalf." *Id*. at ELG-2.

19

78.    Florida Blue's policies also give Florida Blue the right to cancel a member's contract if the member, in applying for coverage with Florida Blue, makes "a fraudulent statement or intentional misrepresentation of a material fact including but not limited to, [the member's] demographic information including [the member's] geographical area[.]" *See, e.g.*, *id.* at ELG-3.

79.    All Florida Blue policies contain the notice excerpted below advising members that Florida Blue relies upon the truth and accuracy of the information provided by the member in their application and directing members to review their application carefully and advise Florida Blue within ten days if any of the information in the application is inaccurate or incomplete.

> **IMPORTANT NOTICE**
>
> In deciding to issue this Contract to you, we relied on the truthfulness and accuracy of the information provided on the application. Please carefully read your application and notify us within 10 days if any of the information on it is incorrect or incomplete. Fraudulent statements or Material Misrepresentations on your application could result in the cancellation or Rescission of your Contract.

80.    And coverage is not effective until Florida Blue receives and accepts the person's application and first premium payment. Florida Blue, like most insurers, requires its members to pay for their own insurance premiums: "[p]remium payments from third-party payors, except those required by law . . . may not be accepted[.]" *Id.* at PRM-1. The third-party payments required by law are payments from: (i) an HIV/AIDS program under title XXVI of the Public Health Service Act; (ii) a Native American tribe or similar organization; (iii) a local,

state, or federal government program; (iv) not-for-profit foundations that are acceptable to Florida Blue when the enrollee meets defined criteria based on financial status; and (v) designated representatives acceptable to Florida Blue such as family members or people holding a properly executed power of attorney. *Id.* None of the limited exceptions in the applicable Florida Blue ACA Plans applied to members in this case.

81.    Florida Blue provides its members with identification cards to present to providers as evidence that the member has health insurance coverage. Those cards contain relevant information about the member's plan and prominently display Florida Blue's logo at the top of the card.

**B.    Florida Blue Relies Upon Providers to Submit Accurate Information In Connection with Enrollment, Treatment and Claims.**

82.    As explained above, when an individual applies for coverage under a Florida Blue individual plan—whether through the Marketplace or another application method—the applicant must provide certain demographic information including their state and county of residence, information about their income and household, and other information to establish they are eligible for coverage under the ACA.

83.    Florida Blue relies upon the accuracy and veracity of information provided by applicants because, for example, if the individual does not reside in Florida, Florida Blue cannot insure them.

84.    Florida Blue also relies upon healthcare providers to submit accurate and truthful information in connection with the treatment of its members and in support of claims for reimbursement.

85.    The Defendants sought pre-approval of SUD treatment from Florida Blue.  To obtain pre-approval, providers are required to submit requests through Webpass, which requires the provider to attest to the member's home address.  As explained above, Florida Blue is not licensed to insure people who do not reside in Florida.  Thus, the provider's attestation is important.  Webpass also prompts providers to verify that the treatment facility is in the member's home state.  If the provider responds "no" to that prompt, Webpass asks the provider to answer additional questions including why the member was not admitted for treatment in their home state and additional questions about continuation of care post-discharge.

86.    Subsequent requests for continued approval of treatment require providers to attest to the same information about the member's home address, to verify the member's home state, and to provide information about why the member is seeking treatment outside of their home state.

87.    When using Webpass providers must check Item ID 10869, which states: "By clicking the submit button, you are attesting to the fact that all the information provided is accurate and reflected in the patient's medical record."

88.    For all approvals sought on and after December 3, 2025, providers were required to attest as follows: "The information provided in this attestation is

22

true, complete, and accurate to the best of my knowledge and belief. I understand that any misrepresentation may result in denial or termination of participation, privileges, or reimbursement." Additionally, this section includes language certifying that the facility and the treating provider are who they claim to be.

89.    Florida Blue relies upon providers to submit complete and accurate information and to make truthful representations concerning their patients and the treatment and services they provide.  Such information is material to Florida Blue's determination of whether members are eligible for coverage and treatment, whether treatment is medically necessary and to determine coverage and payment.

**C.      Bad Actors Take Advantage of Increased Coverage for Treatment of SUD Mandated by the ACA to Exploit Vulnerable Patients and Defraud Health Insurers.**

90.    The ACA expanded insurance coverage for residential drug treatment to ensure that people struggling with addiction can access life-saving treatment. Bad actors across the country, including the Defendants, have taken advantage of this expanded coverage through a variety of fraudulent schemes that harm health insurers, consumers of health insurance and some of the most vulnerable members of society.[5]

---

[5] *See* Katrice Bridges Copeland, *Liquid Gold*, 97 Wash. U.L. Rev. 1451, 1454-56 (2020).

91.     These fraudulent schemes commonly rely on "patient brokers,"[6] individuals paid kickbacks to steer insured individuals to specific treatment centers.  Patient brokers often use the Marketplace to enroll patients in health insurance plans and use phony addresses for patients for various reasons including (a) targeting the best-paying health insurance plans; and (b) triggering the change of address exception, which allows patients to enroll in health insurance plans outside of the enrollment period.[7]  Once insurance coverage is secured, patient brokers or people affiliated with out-of-network treatment centers pay insurance premiums, and the patients are sent to the treatment centers which are often far from where the patients live and provide substandard or nonexistent treatment.  The result is that people with SUD do not receive the treatment they need, and the treatment centers submit exorbitant bills to health insurance companies who were often defrauded into providing coverage to the patient in the first place.[8]

### D.     Rampant Fraud and Abuse by SUD Providers in California.

92.     In 2017 authorities in Florida began to crackdown on treatment centers and sober homes after the high-profile federal prosecution of Kenny Chatman, an operator of treatment centers and sober living homes in South

---

[6] *See* David Armstrong and Evan Allen, *Desperate for addiction treatment, patients are pawns in lucrative insurance fraud scheme*, Boston Globe (July 7, 2017), available at https://perma.cc/Z3DH-QRBQ.

[7] *Id.*

[8] *Id.*

Florida.[9]  In the view of one Florida prosecutor, efforts undertaken in Florida to target abuses in the SUD treatment industry "has driven many of the rogue rehabs out of that state – and straight to Southern California."[10]

93.    In 2018, there were 1,117 licensed rehabilitation centers in the Los Angeles basin in Southern California, known by people in the industry as the "Rehab Riveria."[11]   The Southern California News Group published a series of investigative reports concerning misconduct at SUD facilities in California and discovered that fraud related to drug rehabilitation was becoming a much more significant problem because: (1) millions of Americans had become addicted to opioids, and many states were favoring treatment over incarceration; and (2) "under the rules of Obamacare, insurance companies are required to pay for addiction recovery" so unscrupulous rehabilitation centers were using advertising and "third-party recruiters -- sometimes called 'body brokers' -- to convince addicts from around the country to come to Southern California to get clean. If the patient is insured -- and many people addicted to prescription opiates are – that's

---

[9] *Liquid Gold*, 97 Wash. U.L. Rev. at 1453.

[10] Tony Saavedra, *Florida Prosecutor Dave Aronberg Sees Parallels in Rogue Rehabs in Florida and Southern California*, Orange County Reg. (Mar. 27, 2018), available at https://perma.cc/QWD7-8AYV, https://www.ocregister.com/2018/03/27/florida-prosecutor-dave-aronberg-sees-parallels-in-rogue-rehabs-in-florida-and-southern-california/.

[11] Teri Sforza, *How some Southern California drug rehab centers exploit addiction*, THE ORANGE COUNTY REG. (Nov. 5, 2018), available at https://www.ocregister.com/2017/05/21/how-some-southern-california-drug-rehabcenters-exploit-addiction/.

a plus. But if they're not, some rehab centers pay for the addict to travel to California and sign up for insurance."[12]  People suffering from SUD are often told they are getting rehab "scholarships" when, in reality, the facilities are signing the patients up for health insurance without their consent.[13]  Another significant problem is that "[a]lmost anyone can run a rehab-related business in California. No degree, medical or otherwise, is required to get a license. Some centers are run by ex-cons who earned certificates in rehab center management from prison schools, others by doctors who have had their licenses in the crosshairs of the Medical Board of California." *Id.*

94.    Fraud, waste, and abuse associated with rehabilitation centers in California have caught the attention of federal law enforcement.  For instance, in 2019, the United States Attorney for the District of Connecticut charged R. Jeffrey Yates ("Yates"), the owner of substance abuse treatment facilities in California, and others in connection with a scheme to defraud insurers offering coverage under the ACA by:  "fraudulently enrolling individuals in ACA plans in states where the individuals did not live" and maximizing their profits by "enroll[ing] the individuals in ACA plans in states that paid the highest amount for substance abuse treatment, even though the individuals did not live in those states[;]" and then admitting the newly insured people for treatment at their facilities and billing the

---

[12] *Id.*

[13] *Id.*

26

ACA plans thousands of dollars for that treatment.[14] Yates' co-conspirators, Jeffrey and Nicholas White, pled guilty to conspiracy to commit health care fraud and were sentenced to prison terms and ordered to pay restitution in excess of $27 million.[15] The Whites' role in the scheme included creating phony residential leases in various states for the purpose of enrolling people in individual ACA plans in states where they did not live, paying their insurance premiums, and then transporting them to California for placement in expensive SUD treatment programs, in exchange for which the Whites received kickback payments from the treatment centers.[16]

95.    Fraud by SUD treatment facilities in California persists.  In August of 2025, a grand jury in the Central District of California indicted Nicholas Moore ("Moore"), a patient broker, and charged him with offenses including: conspiracy to solicit, receive, pay, and offer illegal remuneration for referrals to clinical treatment facilities, in violation of 18 U.S.C. §§ 371, 220(a)(1), (2); and illegal remunerations for referrals to clinical treatment facilities, in violation of 26 §

---

[14] *See* United States Attorney's Office, District of Connecticut, Press Release, *Owner of California Substance Abuse Treatment Facilities Charged in Scheme to Defraud ACA Programs* (Nov. 15, 2019), available https://www.justice.gov/usao-ct/pr/owner-california-substance-abuse-treatment-facilities-charged-scheme-defraud-aca-programs.

[15] *See* United States Attorney's Office, District of Connecticut, Press Release, *Father and Son Who Defrauded Numerous State Affordable Care Act Programs Sentenced to Prison* (Feb. 23, 2021), available at https://www.justice.gov/usao-ct/pr/father-and-son-who-defrauded-numerous-state-affordable-care-act-programs-sentenced-prison.

[16] *Id.*

U.S.C. § 7203.[17]   The indictment alleges that Moore: paid kickbacks to co-conspirators who referred patients to him; directed co-conspirators on how to "coach" potential patients to get them admitted to treatment; and received kickback payments from treatment facilities in exchange for patients he had referred.[18]

### E.    Defendants' Scheme to Defraud Florida Blue.

#### 1.    Defendants Fraudulently Enrolled Patients in Florida Blue ACA Plans and Paid Illegal Kickbacks in Furtherance of Their Scheme.

96.    Florida Blue's investigation has established that beginning in 2025 Defendants engaged in a pervasive scheme to illegally obtain millions of dollars from Florida Blue by submitting false and fraudulent claims for SUD treatment at Defendants' California facilities.

97.    Florida Blue's records establish that each Defendant participated in this scheme by submitting at least one claim to Florida Blue during the relevant period for patients who were not eligible for coverage because they were not Florida residents, their premiums were paid by third parties in violation of Florida Blue's policies, and/or their enrollment and/or treatment was procured through fraud. **Exhibit B** to this Complaint identifies fraudulent claims submitted by each of the Defendants to Florida Blue.

---

[17] *See* Indictment, *United States v. Moore*, No. 2:25-cr-672-HDV (C.D. Cal.) (ECF 1).

[18] *Id.*

98.    In furtherance of the scheme, Defendants unlawfully recruited patients from a vulnerable population of people suffering from SUD by offering them inducements to enroll in Florida Blue ACA Plans and seek treatment at Defendants' California facilities, including paying patients' insurance premiums, and paying for transportation, housing, gifts and in some instances providing free drugs.

99.    If prospective patients were uninsured, Defendants and their co-conspirators fraudulently enrolled them in premium Florida Blue ACA Plans. Defendants intentionally selected premium Florida Blue ACA Plans with robust benefits, including plans with out-of-network benefits and plans that did not require co-pays or other member responsibility for SUD treatment.  In some cases, Defendants went so far as enticing enrollees to switch from less expensive coverage with no out-of-network benefits to more expensive benefit plans that offered out-of-network and/or out-of-state coverage to further their scheme.  Defendants fraudulently enrolled patients in Florida Blue ACA Plans by providing false addresses and other demographic information.

100.    To induce patients to enroll in Florida Blue ACA Plans and to obtain SUD treatment at Defendants' California facilities, Defendants and their co-conspirators paid initial and monthly insurance premiums, knowing that they would see a substantial return on their investment in the form of payments from Florida Blue for SUD treatment of Florida Blue members.  Defendants further subsidized their scheme by paying for transportation to California, providing

housing and motels, and supplying free drugs to maintain patient dependence before admitting patients to their facilities.

101.    Defendants' payment for patients' transportation, housing, hotels, drugs, and monthly insurance premiums were illegal kickbacks in violation of: (i) Fla. Stat. § 456.054, which prohibits health care providers from offering, soliciting, paying, or receiving kickbacks for referring or soliciting patients; and (ii) Fla Stat. § 817.505, which prohibits the offer, payment, solicitation, or receipt of any commission, bonus, rebate, kickback, or bribe—in cash or in kind—to induce or reward the referral of patients to or from a healthcare provider or facility.

102.    Defendants knew that they were treating Florida Blue members and submitting claims for payment to Florida Blue because they facilitated the fraudulent enrollment of hundreds of their patients in Florida Blue ACA Plans. Additionally, as explained above, Florida Blue members present Florida Blue identification cards to providers when seeking treatment.

103.    Defendants knew when they submitted claims to Florida Blue that the claims were false and fraudulent.    Defendants and their co-conspirators deliberately misrepresented material facts and concealed their deceptive scheme from Florida Blue because they knew that the information they submitted or failed to disclose was material to Florida Blue's eligibility determinations and claims payment decisions.  For example, Defendants knew that Florida Blue relies upon providers to submit true and accurate information when assessing pre-approval requests for SUD treatment.  Yet Defendants failed to disclose and affirmatively

30

concealed material information when submitting pre-approval requests, including that patients were not Florida residents and that patients sought treatment out-of-state based solely upon illegal recruitment by Defendants and not for any legitimate reason.

104.   In 2025 and 2026, Florida Blue paid Defendants $52,194,167 for claims that were fraudulent and not payable under the terms and conditions of the Florida Blue plans.

105.   Pursuant to the process described in Paragraphs 68-70 above, and based upon its belief that enrollments were fraudulent, Florida Blue has (thus far) requested CMS approval to rescind 60 ACA policies issued to so-called members who were recruited and treated by Defendants. CMS approved all 60 rescission requests.  Additional rescission requests are currently pending submission to CMS.

### i. Defendants and Their Co-Conspirators Used Common Payment Sources to Pay Insurance Premiums for Hundreds of Florida Blue Members.

106.   Evidence that Defendants and their co-conspirators paid for members' insurance premiums is established, in part, by data showing that premiums were paid from the same payment sources for many different members, all of whom were treated by Defendants.

107.   Each premium payment from a member is linked to a payment source, *e.g.,* credit card, debit card, bank account, which is assigned a unique alphanumeric identifier commonly referred to as a "fingerprint."  The fingerprint also reflects the date and time of the payments.

108. The identification numbers (or fingerprints) in Florida Blue's premium payment data demonstrate that 92 percent of members treated by Defendants shared common payment sources or fingerprints for premium payments for at least one premium payment. **Exhibit C**. In many instances, the same payment source was used on the same date, in rapid succession to pay premiums for groups of Florida Blue members who were treated by Defendants.

109. For example, data compiled by Florida Blue shows that a single payment source was used to pay Florida Blue insurance premiums for 75 individual members who were treated at 8 of Defendants' California facilities, including 34 individuals treated at Innervisions Recovery Center LLC, 13 individuals treated at Sun and Moon Rehabilitation, 12 individuals treated at Clear Conscience Treatment Center, and 8 individuals treated at Comfort Recovery IOP LLC. *See* **Exhibit D** (Columns A, B & C).

110. Florida Blue's premium-payment data reflects dozens of instances in which a single payment source was used to pay the premiums of five or more unique individuals on the same day, and numerous instances in which five or more such payments were made in a single rapid burst, each within minutes of the next.

111. For example, on December 30, 2025, a single debit card was used to make premium payments for 11 different Florida Blue members in a span of approximately twenty-nine minutes (from 4:56 p.m. to 5:26 p.m.) with successive payments made roughly one-and-a-half to three minutes apart and totaling approximately $13,155.35. *See* **Exhibit E**. The 11 members were treated at four of

Defendants' California facilities including Uplift Recovery Noho LLC, Essence Recovery Center Inc., Uplift Recovery Center LLC and Avan Wellness Center.

112.    In total, more than 90 distinct payment sources were used to pay premiums for five or more different members, and more than 50 were each used to pay premiums for ten or more different members; a single payment source was used to pay the premiums of as many as 75 different members. *See* **Exhibit C**.  In addition, approximately eighteen percent of these premium payments were made using prepaid cards, which is a difficult-to-trace payment instrument and further is inconsistent with legitimate members paying their own recurring monthly premiums. This pattern of batched, rapid-fire premium payments from common and frequently untraceable sources is not consistent with individual members independently paying for their own coverage and instead demonstrates that Defendants and their co-conspirators paid members' premiums to enroll and maintain them in Florida Blue plans for the purpose of billing for SUD treatment.

113.    This compelling common fingerprint evidence coupled with Florida Blue records, data and patient interviews demonstrates that Defendants and their co-conspirators paid member premiums in violation of Florida law and Florida Blue's policies requiring members to pay their own premiums.

114.    After fraudulently enrolling patients in Florida Blue ACA Plans, Defendants and their co-conspirators paid, arranged for, or facilitated payment of those members' premiums to maintain coverage for purposes of submitting claims for SUD treatment.

33

### ii.    Defendants and Their Co-Conspirators Used Bogus Florida Addresses to Enroll Prospective Patients in Florida Blue ACA Plans.

115.    In addition to paying patients illegal kickbacks to induce them to seek SUD treatment at Defendants' California facilities, Defendants and their co-conspirators supplied prospective patients and Florida Blue with fake Florida addresses for the sole purpose of fraudulently recruiting vulnerable people in furtherance of their fraudulent scheme.

116.    As explained above, Florida Blue is not licensed to provide health insurance to non-Florida residents.  Based upon Florida Blue's investigation, at least 30 percent of the individuals for whom Defendants submitted claims to Florida Blue did not reside in Florida when they enrolled in a Florida Blue ACA Plan. Florida Blue's investigation revealed that individuals who used fake Florida addresses were recruited, assisted, and directed by Defendants and their co-conspirators to use those addresses for the purpose of fraudulently enrolling in Florida Blue ACA Plans.

117.    For example, Florida Blue enrollment records show that 67 members who received treatment at Defendant Uplift Recovery's facilities and 62 members who received treatment at Defendant Essence Recovery's facilities used the same address – an emergency only Salvation Army Shelter located at 1603 N. Florida Ave., Tampa, Florida – as their home address.

118.    Florida Blue enrollment records also show that 48 members who received treatment at Defendant Uplift Recovery's facilities and 42 members who

34

received treatment at Defendant Essence Recovery's facilities used the same address – the Coalition for the Homeless of Central Florida, 18 N. Terry Avenue, Orlando, Florida – as their home address.

119.    Another nine members who received treatment at Defendants' California facilities used the Courageous Church, located at 1602 N. Florida Ave., Tampa, Florida 33602, as their enrollment address.  Investigation reveals that the Courageous Church is not a shelter; rather, it is a church located directly across the street from the Salvation Army Shelter at 1603 N. Florida Ave., another address used by numerous members. *See* https://courageouschurch.online/about.

120.    In all, between 15 and 20 percent of patients for whom Defendants billed Florida Blue used homeless shelters or temporary facilities in Florida as their enrollment addresses.    This disproportionate population demonstrates Defendants' intention to target, recruit and exploit vulnerable members of society.

### iii.  Additional Evidence of Defendants' Scheme.

121.    Defendants' fraudulent conduct is further demonstrated by the extraordinarily large number of Florida Blue members who received treatment at Defendants' California facilities in 2025. For example, 30 Florida Blue members were treated at Defendants facilities in Q4 of 2024 compared to 694 in Q4 of 2025. California licensing records establish the maximum number of inpatient detoxification beds each Defendant inpatient-facility is authorized to operate. Claims submitted to Florida Blue by Defendants show that Florida Blue "members" alone frequently represented most of Defendants' licensed capacity, often

accounting for more than 50% of the facility's licensed inpatient capacity. On some days, the number of out-of-state Florida Blue members obtaining treatment at Defendants' facilities exceeded 100% of the licensed capacity before accounting for patients insured by other health plans or paying through other sources. *See* **Exhibit F**. For example, on 26 separate days between January 2025 and January 2026, Defendant Uplift Recovery Center LLC submitted claims to Florida Blue for treatment of more patients than California law authorized it to treat, with Florida Blue members alone exceeding the facility's licensed capacity.

122. By way of further illustration, between January 2025 and January 2026, Florida Blue members accounted for more than 50% of Entrust Recovery Center Inc.'s licensed inpatient capacity on 229 separate days. During that same period, Florida Blue members accounted for more than 50% of Inspire Recovery Center Inc.'s licensed inpatient capacity on 224 separate days, including 95 days on which the number of Florida Blue members alone exceeded the facility's total licensed capacity. *See* **Exhibit F**.

123. On certain days in 2025, a substantial majority of the patients who received treatment at Defendants' California facilities were Florida Blue members; and on some days Florida Blue members accounted for nearly all of a facility's reported patients. *See* **Exhibit F**. Moreover, on certain days the number of Florida Blue members purportedly treated by Defendants exceeded the total number of patients that the facility was licensed to treat. In other words, Defendants billed Florida Blue for treatment of more patients than the facility was lawfully permitted

36

to treat. *See* **Exhibit F.**   It strains credulity that so many Florida residents would, unbidden by Defendants, enroll in Florida Blue ACA Plans and then travel to California to receive treatment by out-of-network providers.

124.   Beyond injuring Florida Blue, Defendants' treatment records demonstrate harm to patients themselves.   Defendants moved patients between different facilities and treated more patients than they were legally permitted to treat, calling into question the efficacy of their treatment of physically and emotionally vulnerable individuals.

125.   The timing of members' enrollment and treatment further confirms that purported enrollments were orchestrated by Defendants for the sole purpose of generating false and fraudulent claims to Florida Blue.   Specifically, Florida Blue's data shows a pattern of patients beginning treatment at the same time of their initial enrollment in Florida Blue plans – sometimes on the same day.   This extraordinarily short time span between enrollment and treatment indicates that patients were enrolled **after they were transported to California**, which is compelling evidence of fraudulent enrollments.   Indeed, Florida Blue's data shows that, of the almost 1,300 members, roughly 100 members began treatment at a Defendant facility on the very same day they enrolled, nearly half (approximately 584 members) began treatment within five days of enrolling, and approximately 65 percent began treatment within ten days. This pattern, which was repeated across hundreds of members and dozens of Defendants' facilities, demonstrates

37

that Defendants and their co-conspirators coordinated their effort to solicit and improperly enroll vulnerable people in Florida Blue ACA Plans. *See* **Exhibit G**.

126. Members enrolled in Florida Blue plans by Defendants began treatment at their California facilities on the same day in alarming numbers: 21 of 200 at Defendant Uplift Recovery Noho LLC (10.5%), 10 of 55 first-time members at Defendant Innervisions Recovery Center LLC (18.2%), 7 of 44 first-time members at Defendant Lakeridge Recovery Center (15.9%), and 6 of 109 first-time members at Defendant Essence Recovery Center Inc. (5.8%). *See* **Exhibit G**.

127. The pattern is even more troubling when examining treatment commenced within one to five days of first-ever enrollment in a Florida Blue plan. During this period, 126 of 200 first-time members treated at Defendant Uplift Recovery Noho LLC (63%) received treatment within five days of enrollment, 24 of 55 first-time members at Defendant Innervisions Recovery Center LLC (43.6%) received treatment within five days, 28 of 44 first-time members at Defendant Lakeridge Recovery Center (63.6%) received treatment within five days, and 51 of 109 first-time members at Defendant Essence Recovery Center Inc. (46.8%) received treatment within five days. Across these four Defendants alone, between 43.6% and 63% of first-time enrollees began treatment within five days of enrollment. *See* **Exhibit G**.

128. Defendants' ability to execute their coordinated scheme was aided by common ownership and other connections among them. For example: (1) Uplift Recovery is believed to be the parent company of Uplift Noho, Inspire Recovery,

38

and Lakeridge Recovery; (2) Entrust Recovery is believed to be the parent company of Harmony Hills Recovery; (3) New Life is believed to be the parent company of Meta Wellness and LNA Realty; and (4) Vanity Wellness is believed to be the parent company of Vanity Detox.

129. Coordination among Defendants is further evidenced by the pattern of patient referrals among facilities with common ownership. For example, Uplift Recovery, Uplift Noho, Inspire Recovery, and Lakeridge Recovery—which are believed to share common ownership—collectively treated hundreds of Florida Blue members who, as explained above, moved from one facility to another. Similarly, Entrust Recovery and Harmony Hills Recovery—which are believed to share common ownership—treated overlapping patient populations. This pattern of inter-facility patient movement within corporate family groups demonstrates coordination and agreement among the commonly owned Defendants.

130. Additional evidence that Defendants operated as a coordinated network is demonstrated by the use of common registered agents. According to California government records: (1) the same person serves as the registered agent for MAS Pro, AMS Pro, and Pathway to Recovery; (2) the same person serves as the registered agent for Comfort Recovery, Comfort Recovery Treatment, and Clear Conscience Treatment Center; and (3) the same person serves as the registered agent for Love & Light Recovery and Spiritual Wellness.

131. Florida Blue's data establishes that Defendants moved Florida Blue members around their facilities to increase the number of claims they could submit

39

for each recruited patient. Of approximately 1,300 members for whom Defendants billed Florida Blue, nearly 300 received treatment at more than one Defendant facility. One member was billed for treatment across seven different facilities, and other members were billed across four or five facilities each. This repeated movement of the same members among facilities reflects Defendants' coordinated effort to maximize the volume of claims submitted for each patient they recruited. *See* **Exhibit H.**

**F.    Representative Examples of Defendants' Fraud Scheme.**

**1.    F.J.**

132.    In early 2026, a person named "Dalton," who was an associate of Defendants, recruited F.J. and eight other people, all of whom were in Orlando, Florida at the time, to undergo SUD treatment at Defendant Uplift Recovery in California.

133.    As a first step, Dalton or others associated with Uplift Recovery used biographical information from F.J.'s identification and her social security number to enroll F.J. in a Florida Blue ACA Plan – the 24J01 Plan.

134.    When they applied to enroll F.J. in the Florida Blue Plan, Dalton and/or his associates used the address for the campus of the Coalition for the Homeless of Central Florida (18 North Terry Avenue, Orlando, Florida), rather than F.J.'s actual address.

135. Others who were recruited by Dalton along with F.J. were homeless. Those without identification were taken by Dalton and/or his associates to the DMV to obtain identification.

136. Dalton and his associates transported F.J. and the others to the Royal Inn Motel in Orlando, Florida, where they stayed for a few days before being flown to California for treatment at Uplift Recovery.

137. F.J. did not pay for either her motel or her flight to California. Upon information and belief, Uplift Recovery or one of its co-conspirators paid for F.J.'s motel and travel expenses.

138. Before arriving at Uplift Recovery, F.J. and the others were paid by Dalton and/or his associates to continue using drugs.

139. F.J. stayed at Uplift Recovery from approximately January 5, 2026 to January 27, 2026.

140. Upon information and belief, Uplift Recovery or one of its co-conspirators paid F.J.'s insurance premium.

141. Information obtained by Florida Blue further establishes that premium payments for F.J. and at least four other newly enrolled Florida Blue members (described above) were paid by Uplift Recovery or one of its co-conspirators. Specifically, the premium payments were all paid on the same day, within minutes of one another by the same debit card.

142. Florida Blue's data further establishes that the coordinated payment activity was not limited to F.J. and the four other newly enrolled members

41

described above. Upon information and belief, between September 2025 and February 2026, Defendants and their co-conspirators paid premiums for at least 47 other Florida Blue members using the same debit card they used to pay F.J.'s premium. This data further demonstrates that Uplift Recovery and/or its co-conspirators paid, arranged for, or facilitated premium payments for multiple Florida Blue members to maintain coverage for these members to further their fraudulent scheme.

143. Uplift Recovery submitted approximately $511,750 in claims to Florida Blue for services purportedly provided to F.J. between January 5, 2026 and January 27, 2026. Florida Blue placed a hold on those claims.

144. At the end of January 2026, F.J. was discharged from Uplift Recovery because "there was a problem with her insurance." F.J. was flown back to Orlando, Florida. Uplift Recovery paid for F.J.'s transportation.

### 2.    E.P.

145. E.P. was enrolled in Florida Blue's Blue Options Plan 24J106U-R1, effective September 1, 2025. E.P. was a resident of Oklahoma at the time of his enrollment and he currently resides in Oklahoma. A Florida address where E.P. had resided until late 2024 or early 2025 was used on E.P.'s enrollment application.

146. An unknown person with whom E.P. had a telephone conversation helped him enroll in a Florida Blue ACA Plan.

42

147. After enrolling with Florida Blue, E.P. underwent SUD treatment at Defendant Comfort Recovery in California for approximately three months. E.P. did not pay for his flight to California. Upon information and belief, Defendant Comfort Recovery paid E.P.'s premiums and his transportation to California.

### 3.   C.G.

148. C.G. learned about Defendant Sun and Moon through Facebook postings and subsequently underwent SUD treatment there.

149. An unknown person associated with Sun and Moon enrolled C.G. in Florida Blue's Blue Options Plan 24J106U-R1. At the time of her enrollment with Florida Blue, C.G. resided in Louisiana. The Sun and Moon associate used a fake address in Punta Gorda, Florida when they enrolled C.G. with Florida Blue.

150. Upon information and belief, Sun and Moon also paid for C.G. to fly to California.

151. C.G. made what she believed was a premium payment for her Florida Blue health insurance coverage directly to Sun and Moon rather than to Florida Blue. According to C.G., Sun and Moon made subsequent premium payments to Florida Blue on her behalf.

**COUNT I**
**FRAUD**

152. The allegations in Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

43

153. As described above, Defendants engaged in a fraudulent scheme in which they intentionally made false representations to and concealed information from Florida Blue. Specifically, each Defendant submitted claims for SUD treatment of individuals who were not eligible for Florida Blue coverage because they were not Florida residents and/or were enrolled through fraudulent means. Each Defendant knew or recklessly disregarded that the individuals for whom it submitted claims had been fraudulently enrolled in Florida Blue ACA Plans using false residential addresses and illegal kickbacks.

154. Defendants and/or persons or entities acting on their behalf or in concert with them made false representations on enrollment applications for insurance coverage concerning applicants' eligibility for insurance coverage by Florida Blue, by among other things knowingly:

    a. Submitting enrollment applications falsely representing that applicants were residents of Florida; and

    b. Submitting enrollment applications falsely representing that applicants were entitled to submit enrollment applications during special enrollment periods.

155. Each Defendant and their co-conspirators falsely stated and represented to CMS and Florida Blue that these enrollees resided in Florida at the time of enrollment. These false representations were material in that Florida Blue would not have issued insurance policies to these applicants had it known they were not Florida residents.

44

156.    Additionally, each Defendant submitted at least one request for pre-authorization of SUD treatment to Florida Blue for the patients identified in **Exhibit B**.  As explained above, Webpass required Defendants to attest that patients resided in Florida.  Each Defendant falsely represented on Webpass that patients were residents of Florida and provided false information about patient addresses in support of requests for pre-authorization.  Additionally, in the requests for pre-authorization, each Defendant misrepresented to Florida Blue the reasons why patients sought treatment at their California facilities.  Specifically, each Defendant failed to disclose to Florida Blue that Defendants and their co-conspirators unlawfully recruited patients to obtain treatment at their out-of-state facilities by offering them illegal kickbacks.

157.    Defendants' false statements and omissions were material in that Florida Blue would not have approved the requests for pre-authorization if it had known that the patients were not Florida residents and/or that the patients had been unlawfully recruited by Defendants.

158.    When Defendants made these false representations and material omissions to Florida Blue, Defendants knew them to be false, or at the very least, made them recklessly and without regard for their truth.

159.    Defendants intended to defraud and deceive Florida Blue, and to induce Florida Blue to act in reliance on their false representations and material omissions. Likewise, when Defendants concealed or omitted material information

from Florida Blue, they did so with the intent to induce Florida Blue to enroll members and pay Defendants based upon inaccurate and incomplete information.

160.   Florida Blue reasonably relied on Defendants' false representations, concealments and omissions by, among other things, issuing coverage for people who were not eligible for coverage and paying claims that were not payable under Florida Blue's insurance policies.   Florida Blue's plans explicitly state that, in deciding to issue coverage to the member, Florida Blue "relied on the truthfulness and accuracy" of the information provided in the member's application.   *See* **Exhibit A**.

161.   Florida   Blue's   reliance   on   Defendants'   misrepresentations, concealments and omissions was reasonable.  As explained above, applicants for health insurance coverage from Florida Blue agree that their representations must be truthful and accurate and furthermore Defendants have a legal obligation to submit only accurate and valid information and claims to Florida Blue and to disclose material information.

162.   As a direct and proximate result of Defendants' misrepresentations and concealments, Florida Blue has been damaged by, among other things, paying claims that were not properly payable under Florida Blue's insurance policies.

163.   Florida   Blue's   reliance   on   Defendants'   misrepresentations   and concealments was a substantial factor in causing Florida Blue's harm.

164.   Based   upon   the   conduct   of   Defendants   and   their   co-conspirators, CMS approved Florida Blue's request to rescind policies of 60 members of Florida

Blue. Each Defendant submitted at least one claim to Florida Blue for the 60 so-called members whose policies were rescinded by CMS.

**COUNT II**
**CONSPIRACY TO COMMIT FRAUD**

165. The allegations in Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

166. There was an agreement among Defendants and their co-conspirators to obtain funds from Florida Blue by fraudulent means, including (a) common ownership and corporate relationships among certain Defendants, as detailed in Paragraph 128; (b) the coordinated movement of patients among multiple Defendant facilities, as detailed in Paragraph 131 and Exhibit H; (c) the use of common payment sources to pay insurance premiums for individuals treated at multiple Defendant facilities, as detailed in Paragraphs 106–114 and Exhibits C, D, and E; and (d) the pattern of fraudulent enrollments using the same addresses for patients treated at multiple Defendant facilities, as detailed in Paragraphs 115–120.

167. As alleged in this Complaint, Defendants and their co-conspirators committed overt acts in furtherance of this conspiracy, including, but not limited to, submitting false and fraudulent applications for insurance coverage by Florida Blue, paying member premiums, and inducing patients to present for SUD treatment at Defendants' facilities through free travel and lodging, cash payments, and provision of illegal drugs.

47

168. Florida Blue has suffered damages as a result of the acts done under the conspiracy.

**COUNT III**
**VIOLATION OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**

169. The allegations in Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

170. Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* Each Defendant's conduct constitutes trade or commerce within the meaning of FDUTPA because each Defendant is engaged in the business of providing healthcare services and submitted claims to Florida Blue in exchange for payment.

171. Defendants and their co-conspirators unlawfully solicited and recruited individuals to enroll in Florida Blue ACA Plans and to undergo treatment at their SUD facilities in California by offering to pay and paying lodging, travel expenses, and insurance premiums, and, in some instances, providing them with illegal drugs.

172. Additionally, as described above, Defendants and their co-conspirators fraudulently enrolled members in Florida Blue ACA Plans and submitted false and fraudulent claims for reimbursement for treatment at their California facilities.   Defendants have committed *per se* violations of FDUPTA by

48

their conduct, detailed above, in violation of the following Florida statutes which prohibit deceptive and unfair practices:

     a.    The Florida Patient Brokering Act, Fla Stat. § 817.505, *et seq.*;

     b.    Fla. Stat. § 817.234, which prohibits the filing of false and fraudulent insurance claims and enrollment applications; and

     c.    Fla. Stat. § 456.054, which prohibits health care providers from offering, soliciting, paying, or receiving kickbacks for referring or soliciting patients.

173. Defendants' acts and practices also constitute traditional violations of FDUTPA.

174. Defendants engaged in unfair methods of competition, unconscionable, unfair, and deceptive acts and practices in the conduct of trade or commerce when they used the misconduct described herein to fraudulently enroll patients in Florida Blue ACA plans and deceive Florida Blue in connection with the unlawful and tainted claims for SUD treatment they submitted to Florida Blue.

175. Florida Blue was directly and proximately injured by the conduct of Defendants and their co-conspirators by paying fraudulent claims for SUD treatment that were the result of unlawful inducements and incentives offered to Florida Blue's members and unlawful kickbacks.

176. Florida Blue suffered injury in-fact and actual damages, including lost money and property, as a result of Defendants' and their co-conspirators' conduct.

49

177.    Florida Blue is an "aggrieved party" within the meaning of FDUTPA, Fla. Stat. § 501.211(2), because it suffered actual damages as a direct result of Defendants' deceptive and unfair trade practices. Florida Blue paid claims that were fraudulent and not payable under the terms of Florida Blue's policies. Florida Blue's damages are not speculative; they are established by Florida Blue's payment records and the CMS-approved rescissions of 60 policies based on Defendants' fraudulent conduct.

178.    Defendants' conduct was injurious to Florida consumers because fraud by healthcare providers such as Defendants results in an increase of health care insurance premiums.  Defendants also harmed the patients they recruited by providing them with illegal drugs, failing to provide legitimate treatment, providing substandard treatment, and abruptly and unsafely terminating care when their fraud was uncovered. Defendants further exploited and mistreated these individuals by leading them to believe that they had health insurance coverage when, in fact, they were not eligible for coverage by Florida Blue for the reasons described above.

179.    Florida Blue seeks an award of attorney's fees pursuant to Fla. Sta. § 502.2105(1).

## COUNT IV
## UNJUST ENRICHMENT

180.    The allegations in Paragraphs 1 to 151 above are incorporated by reference as if fully set forth herein.

181. As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, each Defendant has profited and benefited from payments made by Florida Blue for SUD treatment. Each Defendant received payments from Florida Blue for claims submitted for individuals who were fraudulently enrolled in Florida Blue ACA Plans and/or were not eligible for coverage.

182. The circumstances of Defendants' receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Defendants should not be permitted to retain such monies, the amount of which is to be determined at trial.

183. Florida Blue is entitled in equity to seek restitution of Defendants' wrongful profits, revenues, and benefits received as a result of their schemes.

184. Florida Blue pleads this claim to the extent that it is deemed not to have an adequate remedy at law.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT

185. The allegations in Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

186. To the extent Defendants and their co-conspirators did not fraudulently enroll members in Florida Blue ACA Plans, Florida Blue entered into valid and contractually binding insurance contracts with those members. Pursuant to these contracts, members, to obtain and maintain their health insurance

coverage, are obliged to pay monthly premiums and the contracts with Florida Blue permit third party payments in limited circumstances that do not apply to Defendants.

187. Each Defendant knew of Florida Blue's contracts with its members and engaged in conduct intended to interfere with those contracts. Specifically, each Defendant knew that Florida Blue members are contractually required to pay their own insurance premiums, yet each Defendant paid premiums or directed third parties to pay premiums in violation of those contractual obligations. Each Defendant induced Florida Blue members to seek out-of-network SUD treatment at its California facilities by offering illegal kickbacks, including paid travel, lodging, and in some instances drugs, which interfered with the members' contractual obligations to Florida Blue.

188. Defendants interfered intentionally, willfully, and unjustifiably with Florida Blue's contracts with its members by, among other things, paying members' premium obligations, and providing free housing, transportation, cash, and illegal drugs in order to entice insureds to seek and undergo SUD treatment from Defendants.

189. Defendants' procurement of these breaches was without justification or privilege.

190. Defendants' conduct proximately harmed Florida Blue. As a result of Defendants' conduct, Florida Blue's members sought and/or received services they would not have received, or would have received at lower cost to Florida Blue. This

caused Florida Blue to pay for more services, and/or to pay more for services, than it would have paid for if Defendants had not intentionally interfered with Florida Blue's contractual relationships with its members.

**COUNT VI**
**DECLARATORY JUDGMENT**

191.   The allegations in Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

192.   Through this cause of action, Florida Blue seeks declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.* and Federal Rule of Civil Procedure 57.

193.   An actual controversy within the meaning of 28 U.S.C. § 2201 has arisen and now exists between Florida Blue and Defendants concerning whether Florida Blue is obligated to pay the claims identified in **Exhibit B,** which were submitted by Defendants to Florida Blue.  Each Defendant has submitted claims to Florida Blue that Florida Blue contends are not payable. On April 14, 2026, counsel for Defendants sent a letter to Florida Blue stating in pertinent part: "This correspondence serves as a litigation hold and to place Blue Cross and Blue Shield of Florida ('Florida Blue') on formal notice of a dispute arising from Florida Blue's refusal to process and remit payment for properly authorized, medically necessary services rendered to its members who received services from my clients. This letter also demands, possibly pre-emptively, that Florida Blue desist from any attempts retroactively terminate relevant policies or begin any process with the Centers for Medicare and Medicaid Services ("CMS") seeking permission to rescind." *See*

53

**Exhibit I.** The letter concludes by threatening "appropriate action" if Florida Blue does not comply. *Id*. This demand letter establishes that an actual, justiciable controversy exists between Florida Blue and Defendants that is ripe for judicial resolution.

194. As explained above, Florida Blue members must establish residency in Florida to be eligible for enrollment and coverage. Hundreds of individuals identified in **Exhibit B** were not Florida residents when they enrolled in Florida Blue ACA Plans and/or were treated by Defendants. As a result, Florida Blue has no obligation to pay claims submitted by Defendants for those individuals.

195. As explained above, Florida Blue members are required to pay for their own insurance premiums to be eligible for enrollment and coverage. Hundreds of individuals identified in **Exhibit B** did not pay their own premiums. As a result, Florida Blue has no obligation to pay claims submitted by Defendants for those individuals.

196. Consequently, the claims identified in **Exhibit B** are not payable pursuant to the applicable Florida Blue policies because: (1) members identified in **Exhibit B** were not residents of Florida when they enrolled with Florida Blue or on the service dates when they were allegedly treated by Defendants; and (2) Defendants improperly paid monthly premiums for members identified in **Exhibit B**.

197. Florida Blue is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, *et seq*. and Federal Rule of Civil Procedure 57 that the claims identified in

54

**Exhibit B** are not payable under the terms of the applicable Florida Blue plans for the reasons explained above and that Florida Blue is not required to pay Defendants for the claims identified in **Exhibit B.**

**PRAYER FOR RELIEF**

WHEREFORE, Florida Blue respectfully requests a judgment against Defendants, Does 1 through 10, and ABC Companies 1-10 inclusive, as follows:

A.     For damages in an amount to be proven at trial;

B.     For prejudgment interest;

C.     For civil penalties to the extent the law permits;

D.     For other statutory remedies available to Florida Blue to the extent the law

permits;

E.     For an award of costs of its suit to the extent the law permits;

F.     For an award of attorneys' fees to the extent the law permits;

G.      For punitive damages;

H.     For an order enjoining all Defendants from submitting claims in the future to Florida Blue or the Florida Blue plans;

I.     For a declaration from the Court that Defendants are not entitled to any payments from Florida for the unpaid claims identified in **Exhibit B**, and, further, that any sums that Defendants improperly received as alleged above should be set off from any amounts Florida Blue may be found to owe Defendants on any unpaid claims; and

55

J.      For such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Florida Blue demands a jury trial on all issues so triable.

Dated:      July 27, 2026                **CALCAGNI & KANEFSKY LLP**

By:      */s/ Mariellen Dugan*
Mariellen Dugan, Esq.

*Attorneys for Plaintiff Blue Cross and Blue Shield of Florida, Inc.*

**HOLLAND & KNIGHT LLP**

By:      */s/ Laura B. Renstrom*
Laura B. Renstrom
Florida Bar No. 108019
laura.renstrom@hklaw.com
kathleen.griffith@hklaw.com
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000
Facsimile: (904) 358-1872

56